# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### SHREVEPORT DIVISION

| | | |
|---|---|---|
| **TAMMY JEAN LOTT** | * | **CIVIL ACTION NO. 17-0783** |
| **VERSUS** | * | **JUDGE TERRY A. DOUGHTY** |
| **NANCY A. BERRYHILL, ACTING COMMISSIONER, SOCIAL SECURITY ADMINISTRATION** | * | **MAG. JUDGE KAREN L. HAYES** |

### REPORT & RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits. The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons assigned below, it is recommended that the decision of the Commissioner be **REVERSED and REMANDED for further proceedings.**

### Background & Procedural History

Tammy Jean Lott filed the instant applications for Title II Disability Insurance Benefits and Title XVI Supplemental Security Income payments on October 31 and November 10, 2014, respectively. (Tr. 23, 148-155).[1] She alleged disability as of January 4, 2008,[2] because of back and neck problems, ADHD, depression, anxiety disorder, high blood pressure, and

---

[1] Lott filed prior applications on December 14, 2006, which were denied initially, and not further appealed. (Tr. 76). She filed subsequent applications on April 11 and 18, 2013, which were dismissed by an Administrative Law Judge on September 6, 2013, and not further appealed. *Id*.

[2] At the administrative hearing, Lott amended her alleged disability onset date to October 31, 2014, and withdrew her Title II claim. (Tr. 41).

herniated/bulging discs in her back. (Tr. 167, 174). The state agency denied the claims at the initial stage of the administrative process. (Tr. 74-93, 96-102). Thereafter, Lott requested and received an October 22, 2015, hearing before an Administrative Law Judge ("ALJ"). (Tr. 38-68). However, in an April 14, 2016, written decision, the ALJ determined that Lott was not disabled under the Social Security Act, finding at step four of the sequential evaluation process that she was able to return to past relevant work, or alternatively at step five, that she could make an adjustment to work that exists in substantial numbers in the national economy. (Tr. 20-33). Lott sought review of the adverse decision before the Appeals Council. On April 19, 2017, however, the Appeals Council denied Lott's request for review; thus the ALJ's decision became the final decision of the Commissioner. (Tr. 1-3).

On June 19, 2017, Lott filed the instant complaint for judicial review of the Commissioner's decision. She contends that the ALJ's residual functional capacity assessment is not supported by a medical opinion, and therefore is unsupported by substantial evidence. She seeks reversal and remand for an award of benefits.

The matter is fully briefed and ripe.

## **Standard of Review**

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). Substantial evidence is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. at 401.  Substantial evidence lies somewhere between a scintilla and a preponderance.  *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).  A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).  The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.  *Greenspan v. Shalala*, 38 F.3d 232, (5th Cir. 1994).

### Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability.  *See* 42 U.S.C. § 423(a)(1)(D).  The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work.  *See* 42 U.S.C. § 423(d)(2)(A).  Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows,

3

(1)     An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)     An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

(3)      An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

(4)     If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5)     If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

See Boyd v. Apfel, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled. Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987). When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated. Villa v. Sullivan, 895 F.2d 1019, 1022 (5th Cir. 1990). If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis. Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987).

## ALJ's Findings

### I.      Steps One, Two, and Three

The ALJ determined at step one of the sequential evaluation process that the claimant had not engaged in substantial gainful activity during the relevant period. (Tr. 25). At step two, she found that the claimant suffers severe impairments of generalized anxiety disorder, depressive

4

disorder, and history of opiate dependence.  (Tr. 25-27).[3]  She concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process.  (Tr. 27-28).

## II.      Residual Functional Capacity

The ALJ next determined that the claimant retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but limited to work comprised of simple and routine tasks.  (Tr. 28-31).

## III.     Steps Four and Five

At step four, the ALJ employed a vocational expert ("VE") to find that Lott was able to return to her past relevant work as a cashier, as she actually performed that job, and as it is generally performed in the national economy.  (Tr. 31, ).[4]

The ALJ also proceeded to make an alternative step five finding.  At this step, the ALJ determined that the claimant was a younger individual as of the amended alleged disability onset date.  (Tr. 31-32).  She also had a limited education with the ability to communicate in English. *Id*.  Transferability of skills was not material to the decision.  *Id*.

The ALJ then observed that, given the claimant's vocational factors, and if she had an RFC that did not include any non-exertional limitations, the Medical-Vocational Guidelines would direct a finding of not disabled.  20 C.F.R. § 404.1569; Rule 204.00, Appendix 2, Subpart P, Regulations No. 4.  *Id*.  However, because the claimant's RFC *did* include non-exertional

---

[3]  She further found that the claimant's medically determinable impairments of neck and back pain, attention deficit hyperactivity disorder, and hypertension were not severe.  *Id*.

[4]  Past relevant work is defined as "the actual demands of past work or 'the functional demands . . . of the occupation as generally required by employers throughout the national economy.'"  *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987) (citing, Social Security Ruling 82-61).

limitations, the ALJ consulted the VE to determine whether, and to what extent the additional

limitations eroded the occupational base for work at all exertional levels.  *Id*.  In response, the

VE identified the representative jobs of hotel housekeeper – light, *Dictionary of Occupational*

*Titles* ("DOT") Code # 323.687-014; price marker – light, DOT # 209.587-034; and cashier II –

light, DOT # 211.462-010.  (Tr. 32, 63-64).[5]

## Analysis

### I.     Residual Functional Capacity

a)     Non-Exhaustive Chronology of Relevant Medical Evidence

On May 29, 2013, Lott complained to nurse practitioner Stephanie Williams that she was

having migraines more often than not.  (Tr. 232-233).  She had had three emergency room visits

the prior month.  *Id*.  She was diagnosed with migraine/headache and referred to neurology.  *Id*.

On December 6, 2013, Lott was seen by Andrea Blake-McMahon, M.D. for neck and

lower back pain.  (Tr. 298).  She described her pain as a nine on a ten point scale, severe, and

constant.  *Id*.  Her pain was worse with sitting, standing, or walking too long.  *Id*.

On January 3, 2014, Lott returned to Dr. Blake-McMahon for complaints of neck and

lower back pain.  (Tr. 297).  Her pain was characterized by degenerative disc disease of her lower

back, which worsened with movement, and was associated with anxiety, muscle spasms, and

depression.  *Id*.  She was taking Zanaflex and Oxycodone.  *Id*.

---

[5]  The VE responded that for the housekeeper job there were 136,280 positions
nationwide; for the price marker job there were 318,700 positions nationwide; for the cashier II
job, there were 810,060 positions nationwide.  (Tr. 32, 63-64).  This incidence of work
constitutes a significant number of jobs in the "national economy."  42 U.S.C. § 423(d)(2)(A);
*Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000
nationally, constitute a significant number).

On January 6, 2014, Lott was seen at Rehabilitation Services Northwest Louisiana by Greg Brown, M.D.  (Tr. 269-270).  She was having some problems with worsening depression over the holidays, and so he increased her medication dosage.  *Id*.  She believed that it helped with her mood and possibly her anxiety.  *Id*.  She was able to focus and pay attention as long as she took the Vyvanse each morning.  *Id*.  She had a current Global Assessment of Functioning ("GAF") score of 45.  *Id*.[6]

A February 3, 2014, progress note indicated that Lott was seen for complaints of neck and lower back pain.  (Tr. 296).  She reported stabbing pains in her back.  *Id*.  She had experienced the pain for the past nine years.  *Id*.  She described her pain in her lower back as an 8/10, and that it traveled down her leg.  *Id*.  It was severe and constant.  *Id*.

On March 5, 2014, Lott reported to Dr. Blake-McMahon that she had lower back pain down her legs and a sprained ankle.  (Tr. 295).  Her pain was 7-8/10, sharp, aching, and constant.  *Id*.  She also had muscle spasms.  *Id*.  Dr. Blake-McMahon diagnosed Lott with chronic pain.  *Id*.

On April 7, 2014, plaintiff reiterated her complaints of chronic back pain to Dr. Blake-McMahon.  (Tr. 293).  Her pain was at its worst while walking.  *Id*.

On April 14, 2014, Lott returned to Dr. Brown.  (Tr. 267-268).  She denied any major problems staying focused or concentrating lately, and explained that she only had trouble keeping up when things became really hectic.  *Id*.  She had a current GAF of 50.  *Id*.

---

[6]  "GAF is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'"  *Boyd*, 239 F.3d at 701 n2 (citing AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994) (DSM-IV)).

A GAF of 41-50 denotes "**[s]erious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting ) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)."  *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition DSM-IV, p. 32.

On May 21, 2014, Lott attended an appointment with psychiatric consultant, Greg Stephens, M.D., who noted that Lott was positive for anger, substance abuse, impulsivity, and anxiety.  (Tr. 319-320).  Her attention was low, with decreased mood, interest, and activity level.  *Id*.  Stephens diagnosed major depressive disorder, PTSD, and ADHD by history.  *Id*.  He assigned a GAF of 53-54.  *Id*.[7]

Dr. Brown saw Lott again on June 9, 2014.  (Tr. 265-266).  Her primary diagnosis was major depressive disorder, recurrent, severe without psychosis; anxiety disorder, NOS; and ADHD - combined type.  *Id*.  Lott reported that her pain was under better control with suboxone.  *Id*.  She admitted becoming rather stressed and anxious at times trying to deal with her young daughter.  *Id*.  She denied any recent problems becoming overly depressed, irritable or angry.  *Id*.

On July 28, 2014, Lott was hospitalized for colitis.  (Tr. 271-274).  She was discharged on August 1, 2014, with diagnoses of colitis, malignant hypertension, cystitis, and ADHD.  (Tr. 275-277).

On August 4, 2014, Dr. Brown noted that Lott denied any problems with an irritable or depressed mood except when she had difficulties dealing with her younger daughter.  (Tr. 263-264).  She denied any particular problems with sleeping at night or changes in her energy level.  *Id*.  Brown diagnosed major depressive disorder, recurrent, severe without psychosis; anxiety disorder, NOS; ADHD - combined type; and opiate dependence.  *Id*.  He assigned a current GAF of 55.  *Id*.

Effective August 14, 2014, Lott terminated mental health treatment with Rehabilitation

---

[7]  A GAF of 51-60 is defined as "**[m]oderate symptoms** (e.g. flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, no friends, unable to keep a job). *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, DSM-IV, pg. 32.

Services of Northwest Louisiana, L.L.C./Dr. Brown. (Tr. 260). Upon discharge, the counselor noted that Lott had a history of psychiatric hospitalizations and suicide attempts as well as anxiety from trauma. (Tr. 261-262). She was able to care for herself and her daughter and had good hygiene and grooming skills. *Id*. She received diagnoses for anxiety disorder and depressive disorder. *Id*.

On August 25, 2014, Lott was seen by nurse practitioner Stephanie Williams for medication refill. (Tr. 229-230). She reported that her lower back had been hurting for two days. *Id*. She had obvious muscle spasms with trigger points upon palpation. *Id*. Williams diagnosed generalized anxiety disorder and lumbago. *Id*.

On September 23, 2014, Lott returned to nurse practitioner Stephanie Williams for medication refill. (Tr. 227-228). Lott requested Klonopin and Vyvanse, but tested negative for both medications. *Id*. Williams diagnosed depression – moderate, and advised Lott that they would not prescribe those drugs to her. *Id*.

On November 5, 2014, Lott complained to nurse practitioner Kate Deville about throat and back issues following a slip and fall on slick steps. (Tr. 223-224). She was bruised. *Id*. However, her gait was normal, with no forward or backward list. *Id*. Lott's movements reflected slight pain. *Id*. History and physical findings were consistent with a pulled muscle. *Id*.

On November 12, 2014, Lott returned to nurse practitioner Deville to refill her medication. (Tr. 221-22). She reported that Vyvanse was not in her system because when she was in prison, they flushed her medication. *Id*. Deville diagnosed adult ADD, and documented that they would continue with her current medical management. *Id*. Precautions were given regarding the potential for abuse of the stimulant medication. *Id*. Deville gave her one month of Klonopin, but noted that she needed to find another psychiatrist as soon as possible. *Id*.

9

On December 11, 2014, Lott requested medication refills from nurse practitioner Deville. (Tr. 219-220).  Lott's last drug screen, however, showed oxycodone, noroxycodone, and oxymorphone, but she did not have a valid prescription for the drugs.  *Id*.  She was placed back on suboxone, with a three month supply.  *Id*.  Nurse Deville diagnosed adult ADD, and told Lott no more controlled substances from that clinic.  *Id*.

On January 20, 2015, plaintiff went to the emergency department complaining of a shoulder injury.  (Tr. 456-459).  She had a contusion that she sustained at home from a fall while walking.  *Id*.  Her symptoms were moderate at their worst.  *Id*.  Upon examination, she had some tenderness to the left shoulder.  *Id*.  She exhibited a full active and passive range of motion.  *Id*. A left shoulder x-ray was normal.  (Tr. 463).

Later on January 20, 2015, Lott saw Larry Daniels, M.D., for complaints of insomnia, ADD/ADHD, musculoskeletal pain, and depression.  (Tr. 526-532).  She reported that her ADD/ADHD was constant, and that her symptoms were aggravated by tasks requiring attention to detail and sitting still.  *Id*.  She was distracted easily.  *Id*.  Her musculoskeletal pain was moderate, intermittent, and stable in her left shoulder.  *Id*.  Her pain was relieved by over the counter medication.  *Id*.

On February 19, 2015, Lott returned to Dr. Daniels for cough and back pain.  (Tr. 520-525).  She described her lower back pain as a dull ache, occasional, non-radiating and a 7/10.  *Id*. Her symptoms were aggravated by changing positions, coughing, daily activities, lifting, standing, twisting, and walking.  *Id*.  Her gait was normal, and she experienced moderate pain with motion.  *Id*.  She was anxious with mood swings.  *Id*.

On February 26, 2015, Lott's neck was negative for injury, pain, redness and discharge. (Tr. 447).  However, she was positive for pain stemming from acute injury of the right arm.  *Id*.

Lott saw psychiatrist James Harrold, Jr., M.D., for a scheduled appointment on February 27, 2015. (Tr. 317). She reported that she was in a motor vehicle accident several days earlier, with significant increase in pain pathology. *Id*.

On March 18, 2015, Lott saw Dr. Daniels for follow-up of anxiety, ADHD/ADD, and cough. (Tr. 516-519).

On March 31, 2015, Dr. Harrold noted Lott's continued progressive improvement, but with some break-through pain. (Tr. 316).

On May 18, 2015, Lott returned to Dr. Daniels for back pain and ADD/ADHD. (Tr. 512-515).

Lott went to the emergency department on June 17, 2015, with complaints of headache that was mild at its worst. (Tr. 436-438). Nonetheless, she described her pain as a 9/10. (Tr. 439). This headache was similar to prior episodes. *Id*. She was diagnosed with migraines/headaches, and received a prescription for Imitrex. *Id*.

On June 18, 2015, Lott went to the emergency room with complaints of a fall. (Tr. 306-310). Plaintiff's symptoms were moderate, at their worst. *Id*. Upon examination, she had a full range of motion in all four extremities without weakness. *Id*. Her back pain was moderate. *Id*. She was discharged with a diagnosis for a knee contusion. *Id*.

On July 15, 2015, returned to Dr. Daniels for follow-up of back pain, burn, ADD/ADHD, and anxiety. (Tr. 504-511). Daniels diagnosed ADD, anxiety, and migraines. *Id*.

On August 4, 2015, plaintiff had an appointment with Dr. Harrold. (Tr. 314-315). He prescribed suboxone for chronic pain and opiate dependency. (Tr. 315).

Upon referral of the ALJ, Lott underwent a consultative physical examination on November 23, 2015, with neurologist Osama Ahmed, M.D. (Tr. 535-539). At that time, Lott's

11

chief complaints were lower back pain, migraines, and neck pain.  *Id*.  She stated that her back

pain started in 2008 when she was involved in the first of five motor vehicle accidents.  *Id*.  She

experienced trouble standing for long periods of time, with tingling in her legs bilaterally.  *Id*.

She could stand for about ten to fifteen minutes before the symptoms became too severe.  *Id*.

She could lift about ten pounds.  *Id*.  Her migraines occurred about once per week.  *Id*.  She also

had neck pain that caused her to have trouble looking in her blind spot when driving.  *Id*.

      Upon examination, Lott exhibited a decreased range of motion in her neck and bilateral

shoulders.  *Id*.  Her gait/station was normal, with the ability to rise from a sitting position without

assistance.  *Id*.  However she was unable to stand on tiptoes or her heels and unable to tandem

walk.  *Id*.  She was able to bend and squat partially.  *Id*.  Her grip strength was 4/5, with adequate

fine motor movements and ability to grasp objects bilaterally.  *Id*.  She did not appear depressed

or anxious.  *Id*.

      Dr. Ahmed diagnosed anxiety, ADHD, hypertension, and neck pain.  *Id*.  Based on the

examination and the objective evidence, he opined that Lott should be able to sit for a full

workday, walk, and/or stand occasionally lift/carry less than ten pounds, hold a conversation,

respond appropriately to questions, carry out and remember instructions.  *Id*.  However, she

should not drive a car, required a collar, and was limited in her ability to reach overhead.  *Id*.

      Dr. Ahmed also completed a medical source statement of ability to do work-related

activities (physical).  (Tr. 540-543).  He indicated that Lott could lift less than ten pounds, stand

and/or walk for less than two hours in an eight hour day; sit about six hours in an eight hour day;

and was limited in her ability to push and pull with her upper and lower extremities.  *Id*.  She

occasionally could balance, but never climb, kneel, crouch, or crawl.  *Id*.  Her ability to reach

also was limited.  *Id*.

At the request of the ALJ, Lott underwent a consultative psychological examination on January 27, 2016, with Thomas Staats, Ph.D. (Tr. 548-553). Staats found Lott's presentation to be reliable. *Id*. Lott reported that she was unable to work because of moderately severe multiple site chronic pain in her upper and lower back and down both legs at an average intensity of 8/10. *Id*. She also reported an average of eight migraine headaches per month accompanied by nausea, vomiting, sonophobia, and photophobia. *Id*. She reported that she was unable to take her medication for Attention Deficit Hyperactivity Disorder and Generalized Anxiety Disorder because she was on suboxone regimen for treatment of chronic pain. *Id*. She stated that she continued to suffer from depression with occasional angry outbursts, destructiveness, and aggression. *Id*. She was frustrated that she had to be off of anxiety and ADHD medication because she was on suboxone. *Id*. She did not report any current symptoms related to PTSD. *Id*.

Staats reviewed plaintiff's treatment records. *Id*. He noted that she was marginal in appearance, and displayed adequate hygiene. *Id*. Her motor activity was restless, and her gait was normal. *Id*. She had a lot of conflict with an assistant manager at her prior job. *Id*. Ultimately, she had to quit because of chronic pain and trouble with her daughter's daycare. *Id*. Lott was in acute distress from pain. *Id*. She occasionally would "go off" on others and even hit or fight them. *Id*. She complained of chronic anxiety and excessive worry, and demonstrated restlessness, muscle tension, intrusiveness, hand play, pain behaviors, and a whiney voice quality. *Id*.

She exhibited a pain disorder, with moderately severe somatic fixation. *Id*. Her judgment was marginal. *Id*. Abstraction was poor, with adequate insight. *Id*. Short term/immediate memory was intact. *Id*. Her intermediate memory was marginal. *Id*. Overall, attention and concentration were marginal. *Id*. Her mental persistence was poor. *Id*. She

13

maintained one-third of the household chores, deferring to her father and boyfriend for the remainder. *Id*. She reported a past history of trouble getting along with teachers, student peers, and supervisors. *Id*. She reported no physician-diagnosed physical limitations or medical restrictions which would limit her ability to work. *Id*. Working speed was marginal. *Id*. She reported poor stress tolerance, and poor ability to adapt to change. *Id*. Her social interaction and adaptation were poor. *Id*. Staats diagnosed unspecified depressive disorder, generalized anxiety disorder, severe somatic symptom disorder with predominant persistent pain, psychological factors, and mild attention deficit hyperactivity disorder. *Id*.

Staats also completed a medical source statement of ability to do work-related activities (mental). (Tr. 545-547). He indicated that Lott had mild limitations in her ability to make judgments on simple work-related decisions, to understand, remember, and carry out complex instructions, and to make judgments on complex work-related decisions. *Id*. He added that she had low average intelligence and marginal judgment. *Id*. Her immediate memory was within normal limits, but her intermediate memory was marginal. *Id*. She could recall only two of three items after several minutes. *Id*. Attention and concentration were marginal, and she was unable to take ADHD or anxiety medications because she was on suboxone therapy. *Id*. He further indicated that Lott had a marked limitation in her ability to get along with supervisors, and an extreme limitation in her ability to respond appropriately to usual work situations and to changes in a routine work setting. *Id*. She suffered from an unspecified depressive disorder with occasional angry outbursts, aggression, and/or destructiveness. *Id*. She handled conflict poorly. *Id*. Her generalized anxiety disorder could not be medicated because she was on suboxone for chronic pain. *Id*.

14

b)    Discussion

At the conclusion of the hearing in this matter, the ALJ told plaintiff that she intended to

send her to a couple of consultative evaluations.  (Tr. 66-67).  The Commissioner's Hearings,

Appeals and Litigation Law Manual ("HALLEX") authorizes an ALJ to take this course of action

when "the claimant does not provide adequate evidence about his or her impairment(s) for the

ALJ to determine whether the claimant is disabled or blind, and the ALJ or the HO staff is unable

to obtain adequate evidence from the claimant's medical source(s) . . . "  (HALLEX § I-2-5-20

(2016)).

In other words, by directing plaintiff to attend post-hearing consultative examinations, the

ALJ implicitly determined that the record on file was insufficient to determine whether Lott was

disabled.  Nonetheless in her decision, the ALJ proceeded to discount the findings of both

consultative examiners selected by the state agency (Drs. Ahmed and Staats), and instead

proceeded to assess the effects of plaintiff's impairments as she perceived them, on the basis of

the basis of the same record that she previously found to be equivocal.[8]

It is axiomatic that the "the ALJ is free to reject the opinion of any physician when the

evidence supports a contrary conclusion.'" *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th

---

[8]  The instant case is atypical in the sense that the ALJ found that plaintiff's physical
impairments were non-severe, i.e., that they caused such "a slight abnormality [having] such
minimal effect on the individual that [they]would not be expected to interfere with the
individual's ability to work, irrespective of age, education or work experience." *Loza v. Apfel*,
219 F.3d 378, 391 (5th Cir. 2000) (citing *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir.1985)).
However, when, as here, the ALJ's analysis proceeds beyond step two of the sequential
evaluation process, the effect of the ALJ's step two determination is measured, inter alia, by
whether her RFC is supported by substantial evidence.  This is so because once at least one
severe impairment is determined to exist, all medically determinable impairments must be
considered in the remaining steps of the sequential analysis.  *See* 20 C.F.R. §§ 404.1545,
416.945.

Cir.1995) (citation omitted).  However, an ALJ cannot reject a medical opinion without an explanation supported by good cause.  *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir.2000) (citations omitted).

Here, the ALJ accorded Dr. Ahmed's opinion "no weight" because she said that it was "far more restrictive than his findings or the totality of the evidence supports.  Claimant has normal mobility, normal organ functioning, and essentially normal neurological functioning." (Tr. 27).  Dr. Ahmed, however, is a neurologist, and he based his opinion on the "examination and the *objective* evidence."  (Tr. 537, 543) (emphasis added).  Thus, it appears that the ALJ substituted her own opinion regarding the effects of plaintiff's impairments for that of the medical specialist, Dr. Ahmed.[9]

Similarly, the ALJ accorded "little weight" to Dr. Staats' opinion because it was

> based primarily on the subjective complaints of the claimant, which seemed more severe at her consultative examination than any other point in the record.  It is also inconsistent with claimant's current level of functioning.  Claimant is able to engage in her activities of daily living and care of her daughter without assistance. It is also inconsistent with treatment records from other clinicians that show her symptoms appeared stable with medication.

(Tr. 31).

However, the ALJ glossed over the fact that Staats reviewed plaintiff's treatment records, which included her disability application, and records from Mental Health Solutions, Minden Medical Center, David Raines Community Health, and Willis Knighton Bossier.  (Tr. 548-549).

---

[9]  In her opposition brief, the Commissioner noted that non-examining agency physician, Gurcharan Singh, M.D., indicated that plaintiff's impairments appeared to be non-severe.  *See* Tr. 79-80.  However, the ALJ neither relied on, nor even mentioned Dr. Singh's findings in her decision.  Moreover,  the reports of non-examining physicians do not provide substantial evidence when the non-examining physician's medical conclusions "contradict or are unsupported by findings made by an examining physician."  *Villa v. Sullivan,* 895 F.2d 1019,1024 (5th Cir. 1990) (citing *inter alia*, *Strickland v. Harris*, 615 F.2d 1103, 1109-10 (5th Cir. 1980)).

Therefore, Staats' opinion was influenced by more than plaintiff's presentation on the day of the examination.  The ALJ cannot simply "pick and choose" those portions of the psychologist's findings that support her decision and discard the remainder.  *Loza, supra*.

Furthermore, other treating psychiatrists assigned GAFs to Lott that were consistent with moderate or even serious mental impairment.  The ALJ discounted the GAF ratings in globo  by remarking that GAF scores sometimes reflected other issues besides work-related functional limitations.  *See* Tr. 31.  While the ALJ's statement is correct, it only serves to highlight the ambiguity in plaintiff's treatment records that necessitated the consultative examination in the first place.  However, the ALJ rejected the consultative examiners' findings, and proceeded to divine the effects of plaintiff's impairments on her own without the benefit of a credited medical source statement.

The court emphasizes that the absence of a medical source statement does not, in itself, render the record incomplete.  *Ripley v. Chater*, 67 F.3d 552, 557-558 (5th Cir. 1995).  Rather, in such a situation, the court focuses upon whether the ALJ's decision is supported by substantial evidence in the record.  *Id*.

In *Ripley*, the Commissioner argued that the medical evidence substantially supported the ALJ's decision.  *Ripley, supra*.  The Commissioner pointed to medical reports discussing the extent of plaintiff's injuries, including a four year history of back troubles.  *Id*.  However, without reports from qualified medical experts, the Fifth Circuit was unable to conclude that the evidence substantially supported the ALJ's RFC for work even at the sedentary level because the court was unable to determine the "effects of [plaintiff's] conditions, no matter how 'small.'"  *Id*.  In addition, the ALJ purported to ground plaintiff's RFC upon Ripley's activities of daily living.  *Id*., at n. 28.  In so doing, however, the ALJ failed to recognize Ripley's testimony to the

17

contrary.  *Id*.  In the end, the only evidence that described plaintiff's ability to work was plaintiff's own testimony, which, when read in proper context, failed to support the ALJ's RFC. *Id*.

The instant case is materially indistinguishable from *Ripley, supra*.  The record is devoid of a medical source statement that supports the ALJ's RFC.  In an effort to support the RFC, the ALJ recited plaintiff's testimony, medical records, and ability to care for her daughter, but then simply concluded that the physical impairments were non-severe and that her mental impairments were accounted for by the ALJ's own autonomously-derived RFC.

It could be argued that even though the ALJ's assessment of the effects of plaintiff's physical impairments is not supported by substantial evidence, the record, via plaintiff's own testimony and Dr. Ahmed's assessment, supports an RFC for a reduced range of sedentary work, for which the VE testified there exists a substantial number of jobs in the national economy, as evidenced by the sample job of surveillance-system monitor.  (Tr. 64-65).

However, the court is not persuaded that the ALJ's assessment of the effects of plaintiff's mental impairments is supported by substantial evidence.  Dr. Staats endorsed marked and extreme limitations in two areas of functioning, including plaintiff's ability to interact with supervisors and to respond appropriately to changes in a routine work setting.  (Tr. 546).  Social Security Ruling 85-15 emphasizes that,

> [t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; **to respond appropriately to supervision**, coworkers, and usual work situations; and **to deal with changes in a routine work setting**.  A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.

18

SSR 85-15 (emphasis added).[10]

Furthermore, according to the Commissioner's Program Operations Manual System ("POMS"),

> "[s]ubstantial loss" cannot be precisely defined. It does not necessarily relate to any particular adjective, number, or percentage. In practical terms, an individual has a substantial loss of ability to perform a basic mental activity when he/she cannot perform the particular activity in regular, competitive employment but, at best, could do so only in a sheltered work setting where special considerations and attention are provided. **This requires professional judgment, on the basis of the evidence in file in each case**. The impairment in a claim of this type may meet or equal the listed medical criteria. **Therefore, before making a determination that includes vocational evaluation, the adjudicator should discuss the case with a psychiatrist or psychologist to learn whether a significant part of the evidence had been previously overlooked or underrated**.

POMS, DI 25020.010 *Mental Limitations* (emphasis added).

Again, however, conspicuously absent from the instant record is a valid medical source statement by any examining psychologist or a mental residual functional capacity assessment by a non-examining agency psychologist.  *See* POMS DI 24510.090, *Mental RFC Assessment Form* SSA-4734-F4-SUP.[11]  Of course, the importance of such medical source statements is to provide the adjudicator with a professional opinion regarding the effects of the claimant's impairments on her functional capacity.

In sum, the court is constrained to find that the ALJ's RFC is not supported by substantial evidence.  *See Williams v. Astrue*, 2009 WL 4716027 (5th Cir. Dec. 10, 2009) (unpubl.) ("an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions"); *Ripley, supra* (substantial evidence lacking where:  no medical assessment

---

[10]  Although social security rulings are not binding on the federal courts, *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001), they are "binding on all components of the Social Security Administration."  20 C.F.R. § 402.35(b)(1).

[11]  A non-examining agency psychologist did review the record, but he concluded that there was insufficient evidence to assess the claimant.  *See* Tr. 81-82.

19

of claimant's residual functional capacity, and claimant's testimony was inconsistent with ALJ's assessment); *Butler v. Barnhart*, Case Number 03-31052 (5th Cir. 06/02/2004) (unpubl.) (in the absence of medical opinion or evidence establishing that the claimant could perform the requisite exertional demands, the ALJ's determination is not supported by substantial evidence).

## II.      Steps Four, Five and Remand

Because the foundation for the ALJ's step four and alternative step five determinations were premised upon an RFC that is not supported by substantial evidence, the court further finds that the Commissioner's ultimate conclusion that plaintiff is not disabled, likewise is not supported by substantial evidence.

The courts enjoy the authority to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  42 U.S.C. §405(g).  When reversal is warranted, the matter is remanded with instructions to make an award only if the record enables the court to conclusively determine that the claimant is entitled to benefits.  *See Ferguson v. Heckler*,  750 F.2d 503, 505 (5th Cir. 1985); *see also Rini v. Harris*, 615 F.2d 625, 627 (5th Cir.1980) (reversing and remanding with direction to enter judgment where the evidence was not substantial and the record clearly showed the claimant's right to benefits).

The instant record is not so disposed.  Plaintiff's residual functional capacity assessment remains indeterminate, and it is not at all clear that she is disabled under the Act.  Upon remand, the Commissioner may contact plaintiff's treating physicians and ask them to complete medical source statements.  The Commissioner also may send plaintiff for new consultative examinations.

### Conclusion

For the foregoing reasons,

IT IS RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent herewith.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen  (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before a final ruling issues.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 6th day of August, 2018.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE

21